ELI HADLEY AND WILLIAM H. HAWKINS *v.* THE CLINTON
COUNTY IMPORTING COMPANY.

1. In executed contracts of sale of personal property, the rule of the common
   law is, *caveat emptor*, and there is no implied warranty as to the quality of the
   article sold. But fraud in the vendor constitutes an exception to the rule.
2. Where the evidence tended to show, that a cow had been sold and purchased
   for a breeder, and to improve the plaintiff's herd of cattle, that there was a
   latent defect, which would greatly impair, if not destroy her capacity to breed;
   that this was known to the vendors, and unknown to the vendees, and was
   not disclosed at the time of sale, and a charge was asked that if these facts
   were found by the jury, then, and in that case, the defendants would be guilty
   of practicing a fraud. Held, that the charge was properly refused, as asking from
   the court a conclusion of fact and not matter of law.
3. The court in response to the charge so asked, said to the jury, that the rule
   of *caveat emptor*, applied to the case, and then in general remarks referred to
   the distinction between *moral* and *legal* fraud, and the necessity that the fraud
   should be *active*,—held, that under the circumstances of the case, the charge
   was calculated to mislead the jury.

ERROR to the district court of Clinton county.

The original action was brought in the court of common
pleas of Clinton county, to recover damages sustained on
account of an alleged defect in a cow, sold by the defendant
to the plaintiffs, and for which the price of $1050 had been
paid. It was claimed that the defendant was liable for the
damages, either on an account of a warranty, as shown by
representations, or on account of an omission to disclose the
defect, amounting to a fraudulent concealment.

The case was appealed to the district court, and was therein
tried at the August term, 1860, to a jury.

It appeared, from the evidence, that the sale was by public
auction, on the 9th of August, 1854. There was a printed
advertisement of the stock to be offered for sale. This ad-
vertisement stated, among other things, that the stock had
been carefully selected by the agents of the company, from
the herds of the most celebrated breeders in England, and
were believed to be equal to any previous importation.
There was a specific description of the animals. Of the one
sold to plaintiffs, the description was: No. "10, Princess,

roan, calved in 1852, bred by R. Thornton Stapleton, got by Lord Newton, dam Kate, by Isaac, (9239)," etc., showing at length the pedigree, and referring to the number in the herd-book. This part of the advertisement was posted on the rump of the cow, and the whole of it was posted in conspicuous places on the fair grounds, where the sale was to take place, and was read by the auctioneer at the time of sale.

The plaintiffs proved that the cow, Princess, on the day of sale, was four years old and upward, instead of being calved in 1852.

The defendant offered evidence tending to prove that the president of the company publicly stated, that, while the company had full confidence in the skill of their agents who had selected the cattle, and in the honor and integrity of the breeders who had sold them, the bidders would have to judge for themselves, for the company warranted nothing. To this evidence the plaintiffs objected, as contradicting the printed advertisement. The objection was overruled, and an exception taken.

Evidence was then given tending to show that the plaintiffs did not hear the statement of the president, and the testimony of one of the plaintiffs was, that the plaintiff, Hawkins, did hear the statement, but did not hear distinctly, or understand correctly, and that he afterward bid in the cow.

The plaintiffs asked the court to instruct the jury, that it was incumbent on the company, if it would avoid its printed warranty that the cow, Princess, was calved in 1852, to show that the plaintiffs had actual knowledge of the fact that the company had determined they would not warrant the cow in question in the particular mentioned. This the court refused to do; but " did charge the jury, after calling their attention specially to the point, as the one upon which the case would probably turn, that if the notice of the fact that the president had announced that the company would not warrant, was brought home to either of the plaintiffs, it would be notice to both, and that if either of them heard any part of the president's announcement from the stand, or heard him call attention to the terms of the sale, it was his duty to pay attention,

and to hear the whole statement truly, and as it was in fact made; and that this would be sufficient to charge both plaintiffs with what was actually said, and to make said announcement a part of the terms of the said sale."

Further evidence was given, "tending to show that the said cow, Princess, had been sold and purchased for a breeder, with a view to the improvement of the plaintiffs' herd of cattle; that, in June previous to said sale, the company, by artificial means, had taken from said cow a calf which had the appearance of being dead for several weeks prior to its delivery, and which would, in the opinion of the defendants (*qu.?* plaintiffs) and other breeders, greatly impair, if not totally destroy her breeding properties, and, in the opinion of other breeders, would not injure or impair her breeding qualities; that this fact had not been made known by advertisement, or any public announcement (but that the calf had been taken away in the presence of a number of persons, the father of one of the plaintiffs being present, among others, and no concealment had been made of the facts), and could not be discovered by any external examinations of said cow; and that the plaintiffs purchased, in entire ignorance of the same; that said cow did afterward bear two calves, but afterward died from disease of her kidneys; and upon examination, her generative organs were found to have been injured: whereupon, the plaintiffs asked the court to instruct the jury, that if they found that the breeding qualities of said cow were materially affected by taking from her said dead calf, and her value was materially injured thereby, and that if said defect could not be discovered on examination, and the plaintiffs were entirely ignorant of the same, and if the defendants knew of said defect at the time of the sale, and failed to disclose the same, knowing that the plaintiffs were purchasing her for a breeder, and to improve their stock of cattle, then and in that state of the case, the defendants would be guilty of practicing a fraud upon the plaintiffs, for which they would be liable to the plaintiffs in this action. This the court refused to do; but did charge the jury, that the rule of *caveat emptor* was applicable to this case. That the seller might be silent, and be

safe. That if he did nothing more than make remarks of simple commendation or praise, he was safe; that he might let the buyer cheat himself *ad libitum*, but not actually, by word, by act, or by artifice, assist him in cheating himself. If the seller was simply silent in the case, and did or said nothing to lead the buyer astray, or to prevent examination or inquiry, though it might amount to moral fraud, yet it would not amount to such fraud as the law takes cognizance of. That the law recognized the necessity of leaving men to take some care of themselves in their business transactions."

To these refusals to charge, and the charges given, the plaintiffs excepted; and a verdict and judgment having been rendered for the defendant, the plaintiffs filed a petition in error in this court.

*D. Linton* and *R. B. Harlan*, for plaintiffs in error.

*B. Hinkson*, for defendant in error.

Gholson, J.—The objection of the plaintiffs to the testimony which showed a declaration of the vendors at the time of the sale, limiting the effect of the statements in the advertisement, was untenable. At the time of the declaration, there was no contract. The advertisement and the declaration are to be taken together, as a proposal to contract, and we know of no rule which, as to the sale in question, would prevent such a proposal being partly written and partly verbal.

We think there was no error in the refusal of the first charge asked by the plaintiffs, and no error to their prejudice in the charge given in connection therewith. The plaintiffs can not justly claim an advantage from which one of them was excluded by his knowledge of the facts. It would be difficult to maintain that a purchaser at a public sale, who so far complies with its terms as to take the property and pay for it, asking no express warranty, could be permitted to show that he did not inform himself of what were the actual terms

of the sale, and derive advantage from the want of full and accurate information.

In refusing the second charge asked by the plaintiffs, the court first saying "that the rule of *caveat emptor* was applicable to this case," gave in charge to the jury, as also applicable to the facts of the case, the substance of a passage in 1 Parsons on Contracts, 461. The full passage is as follows: " If the seller knows of a defect in his goods, which the buyer does not know, and if he had known would not have bought the goods, and the seller is silent, and only silent, his silence is, nevertheless, a moral fraud, and ought, perhaps, on moral grounds, to avoid the transaction. But this *moral* fraud has not yet grown into a *legal* fraud. In cases of this kind there may be circumstances which cause this moral fraud to be a legal fraud, and give the buyer his action on the implied warranty, or on the deceit. And if the seller be not silent, but produce the sale by means of false representations, there the rule of *caveat emptor* does not apply, and the seller is answerable for his fraud. But the weight of authority requires that this should be active fraud. The common law does not oblige a seller to disclose all that he knows, which lessens the value of the property he would sell. He may be silent, leaving the purchaser to inquire and examine for himself, or to require a warranty. He may be silent and be safe ; but if he be more than silent, if by acts, and, certainly, if by words, he leads the buyer astray, inducing him to suppose that he buys with warranty, or otherwise preventing his examination or inquiry, this becomes a fraud of which the law will take cognizance. The distinction seems to be—and it is grounded upon the apparent necessity of leaving men to take some care of themselves in their business transactions—the seller may let the buyer cheat himself *ad libitum,* but must not actively assist him in cheating himself."

To understand the proper meaning and application of this passage, it is important to see in what connection it is found. In the preceding paragraph the author had referred to the rule—*caveat emptor*—as prevailing in England and in this country, but having some exceptions and qualifications ; and

then, and immediately preceding the passage quoted, he says: " One important and universal exception is this : the rule never applies to cases of fraud ; never proposes to protect a seller against his own fraud, nor to disarm a purchaser from a defense or remedy against a seller's fraud. It becomes, therefore, important to know what the law means by fraud in this respect, and what it recognizes as such fraud as will prevent the application of the general rule."

It is evident that the passage which follows is intended to point out some of the marks by which fraud may be known, and this is done in general language. The author could not, in so few words, cover the whole ground, or give a complete description, and certainly did not intend to attempt a definition of fraud, from which it might be determined whether it existed or not in particular cases. It is evident, also, that these marks, by which fraud may be distinguished and known, are proper subjects of inquiry only when the object in view is to ascertain whether the case under consideration comes within the exception which fraud creates to the application of the rule of *caveat emptor*. It was not necessary to refer to them, if the court was correct in the declaration to the jury that the rule was applicable to this case. On the contrary, if there was any evidence in the case which properly required a determination by the jury of the question whether there was fraud in the sale, then the court erred in making that declaration to the jury.

We think there was such evidence ; and that the declaration to the jury that the rule of *caveat emptor* applied to the case, accompanied by the general remarks shown in the bill of exceptions, was calculated to mislead the jury. It is expressly stated in the bill of exceptions that the evidence tended to show that the cow, the subject of the contract, " had been sold and purchased for a breeder, with a view to the improvement of the plaintiff's herd of cattle." This is clearly shown from the advertisement and all the surrounding circumstances—particularly from the price paid, .one thousand and fifty dollars. The vendors can not be said to have been merely silent, and the jury were entitled to inquire whether the whole

truth as to the breeding qualities of the cow should have been disclosed.

Again, as to the duty of the vendors to have disclosed the alleged defect in the cow, it was an important inquiry whether the means of knowledge on the subject was equally accessible to both parties. This is shown in the note to the same passage in Parsons on Contracts, and is said to be " the principle of the text," though this certainly is not very obvious. It is said that " *Laidlaw* v. *Organ*, 3 Wheat., is the leading case on this subject in America," and that " *Kintzing* v. *McElrath* also well illustrates the principle of the text that, where the means of knowledge is accessible to both parties, each must judge for himself, and it is neither the duty of the vendor to communicate to the vendee any superior knowledge which he may have of the commodity, nor of the vendee to disclose to the vendor any facts which he may have, rendering the property more valuable than the vendor supposed." It was said in the latter case, that " the only practicable rule for all cases seems to be that stated by Chief Justice Marshall, that where the means of knowledge is equally accessible to both parties, each must judge for himself." 5 Barr. 467–470.

This very principle, and the character of the cases by which it is illustrated, suggests a distinction between the extrinsic circumstances affecting the market value of the article sold and intrinsic defects; and it is said by the same author, in his second volume (page 273) : " The rule seems to be that a concealment or misrepresentation as to extrinsic facts, which, by affecting the market value of things sold, or in any such way affects the contract, are not fraudulent, while the same concealment of defects in the articles themselves would be fraudulent. But it is perhaps enough to say of this, that a fraud relating to external and collateral matters is treated by the law with less severity than one which refers to things internal and essential." In other words, good sense and the law will more readily authorize the finding that there was an obligation to disclose a latent, intrinsic defect in the article sold, more peculiarly in the knowledge of the vendor, than extrinsic facts affecting its value, as to which the means of

knowledge was equally accessible to both parties. The im portant point, in any case where there is a material latent defect, known to the vendor and unknown to the vendee, is whether, under the circumstances, the omission to disclose it constituted a fraud. It may or may not, under the circumstances, be a fraudulent act, giving a right of action for deceit. Whether it be so is, at least generally, a question of fact, upon which the jury should be allowed to pass, and as the diversity in the circumstances of cases is infinite, and any rules to aid the jury in their inquiry apply to classes of cases, care should be taken that the circumstances of the case show that it may properly fall under the class to which the rule given in charge to the jury applies.

Finding, in accordance with these views, that there was error in the charge given to the jury, a new trial must be had; and as, on that trial, the question may again arise as to the right of the party to the charge asked, it is proper that it should be decided. The plaintiffs asked the court, in view of the evidence stated in the bill of exceptions, to charge the jury, "that if they found that the breeding qualities of said cow were materially affected by taking from her said dead calf, and her value was materially diminished thereby, and that if said defect could not be discovered on examination, and the plaintiffs were entirely ignorant of the same, and if the defendants knew of said defect at the time of the sale, and failed to disclose the same, knowing that the plaintiffs were purchasing her for a breeder, and to improve their stock of cattle, then and in that state of the case the defendants would be guilty of practicing a fraud upon the plaintiffs, for which they would be liable to the plaintiffs in this action." The statement of evidence which precedes the charge, shows that witnesses differed as to the effect on the breeding qualities of the cow of the taking from her the dead calf; but there appears to have been no dispute as to the occurrence of the act, and a knowledge thereof on the part of the defendants. The doubt whether it caused a material defect in the breeding qualities of the cow might be important in deciding whether the omission to disclose the fact was fraud-

ulent; but the plaintiffs had a right to ask a charge, on the assumption that their view of the tendency of the evidence was correct. The charge then, as asked, might properly assume that there was a defect materially affecting the breeding qualities of the cow, known to the vendors, they also knowing that the cow was being purchased for a breeder; that this defect could not be discovered on examination, was unknown to the vendees; and that there was a failure to disclose it at the time of the sale. And the question was whether, as matter of law, the jury finding these facts to exist, there was fraud in the sale?

There certainly are respectable authorities which seem to sustain the right of the plaintiffs to this charge. Thus, in the recent case of *Hoe* v. *Sanburn*, 21 N. Y. Rep. 552, 555, in which the principles of law on the subject of implied warranties are discussed, it is said: "It is a universal doctrine, founded on the plainest principles of natural justice, that whenever the article sold has some latent defect, which is known to the seller, but not to the purchaser, the former is liable for this defect, if he fails to disclose his knowledge on the subject at the time of the sale. In all such cases, where the knowledge of the vendor is proved by direct evidence, his responsibility rests upon the ground of fraud. But there are cases in which the probability of knowledge, on the part of the vendor, is so strong that the courts will presume its existence without proof; and, in these cases, the vendor is held responsible upon an implied warranty. The only difference between these two classes of cases is, that in one the *scienter* is actually proved, in the other it is presumed."

It is said, in Story on Sales (sec. 179), that any concealment by the vendor of latent defects, known to him to exist, but which the vendee could not, by the exercise of proper diligence, have discovered, will be a fraud upon the vendee, which will avoid the contract. There are other American authorities to the same effect.

In the work of Addison on Contracts (page 223), occurs these passages: "But the law does not imply from the mere seller of an article in its natural state, who has no better

means of information than the purchaser, and who does not affirm that the article is fit for any particular purpose, any warranty or undertaking beyond the ordinary promise that he makes no false representation calculated to deceive the purchaser, and practices no deceit or fraudulent concealment, and that he is not cognizant of any latent defect materially affecting the marketable value of the goods. * * * And on the sale and transfer of wares and merchandise, if nothing is said as to the character or quality of the thing sold, the buyer takes the risk of all latent defects unknown to the seller at the time of the execution of the contract of sale; all the seller answers for is, that the article is, as far as he knows, what it appears to be." And see page 220 and cases cited.

Doubtless the cases in which it has been held that a vendor was bound to disclose a latent and material defect in the thing sold, known to him and unknown to the vendee, were each of them correctly decided. The error has been in deducing a general rule of law applicable in all cases of a like character, from the conclusion upon the evidence in a particular case. This error is apt to occur when similar cases are of frequent occurrence. The effect of the retaining possession of property sold by a person indebted, on the question, whether the sale was fraudulent as to creditors, furnishes an apt illustration. It is really, and is now generally held to be evidence of fraud; but it had been held in England, and is still held in some courts in this country, to be fraud in law.

So it may be said of the omission to disclose a latent and material defect—known to the vendor and unknown to the vendee. It is evidence of fraud—evidence, the effect of which the circumstances may strengthen or destroy. It rarely happens that a sale occurs, the circumstances attending which throw no light on the inquiry, as to the effect either of a misrepresentation or concealment. They appear to be governed by like principles. "I make no distinction," says Bayly, J., in *Early* v. *Garrett*, 9 B. & C. 928, 932, "between an active and a passive communication. If a seller fraudulently conceal that which he ought to communicate, it

will render the contract null and void." In either case there must be fraud, and to decide whether there be fraud, knowledge of the fact misrepresented or not communicated is most important. In both, there must be an intention to deceive; but this intention may be imputed, and in some cases will be conclusively imputed, upon the principle that a party must be presumed to intend the necessary consequences of his own acts or conduct. If a vendor omits to disclose a latent defect, which it was, under the circumstances, his duty to disclose, and by such omission receives, as purchase money, many times the real value of the article, he can not say in answer to the action of the purchaser for a deceit, that none was intended.

In the case of *Wilde* v. *Gibson,* 1 H. L. Cas. 605, where the decision of the very learned judge of the court below, Knight Bruce, was reversed, there was an inquiry into the principles applicable in cases of this description. It was a bill to rescind an executed contract; the fraud alleged, was the concealment of a matter alleged to be essential; and the question was expressly held to depend on the same rules which govern an action for deceit. It was said by the lord chancellor: "there can be no direct personal fraud without intention, and there can be no intention without knowledge of the fact concealed or misrepresented." "If you mean," said Lord Campbell, "by *fraud,* an intention to injure the party to whom the representation is made, or to benefit the party who makes the representation, there may be an action of deceit without fraud; but there must be falsehood; there must be an assertion of that which the party making it knows to be untrue; the *scienter* must be either expressly alleged, or there must be an allegation, that is tantamount to the *scienter* of the fraudulent representation, and this allegation must be proved at the trial. * * * There must be a falsehood stated and proved. If that falsehood is stated without any view of benefiting the person who states the falsehood, or of injuring the person to whom the falsehood is stated, in one sense of the word you may say it is not fraudulent, but it is a breach of moral obligation; it is

telling a lie; and if a lie is told whereby a third person is prejudiced, although there may be no profit to the person who tells it, and although no injury was intended to the person to whom it is told, but a benefit to a third person, it is clearly a breach of moral obligation, and is a fraud which will support an action of deceit." 1 H. L. Cas. 633, citing 7 Bing. 106; 3 B. & Ad. 123; 8 Bing. 37; and see *Thom* v. *Bigland*, 8 Exch. 725, 731; *Evans* v. *Edmonds*, 13 C. B. 777.

It has been said that between the *allegatio falsi* and the *suppressio veri*, there is only this distinction, that the non-disclosure, in order to constitute fraud, must be of facts which the seller was under an obligation to disclose. Smith's Law of Contracts, 150, note; 1 Story's Eq. sec. 207; *Otis* v. *Raymond*, 3 Conn. 413. This obligation to disclose, will be found to arise from something in the acts or conduct of the vendor in connection with the sale—doing something or saying something, which, for want of the disclosure, is false and deceptive. The old adage applies, that half the truth is a lie. It is in this view, that the principles governing false representations become applicable, and as, in the case of a false representation, a fraudulent intention in concealing the fact which ought to have been disclosed, need not appear, it will suffice to sustain the action, if the fact having been improperly concealed, there was a falsehood to the defendant's knowledge, which produced a damage to the plaintiff. *Thom* v. *Bigland*, 8 Exch. 725, 731; *Polhill* v. *Walter*, 3 B. & Ad. 114; *Collins* v. *Evans*, 5 Q. B. 820; *Ormod* v. *Huth*, 14 M. & W. 651; *Railton* v. *Matthews*, 10 Cl. & Fin. 934–994; *Blydenburgh* v. *Welsh*, Baldw. C. C. R. 331–337; *Cornelius* v. *Molloy*, 7 Penn. St. 293, 299.

We have expressed these views to show, first, that the court properly refused the charge as asked, the facts on which the charge was predicated not constituting fraud as matter of law, but only evidence tending to establish fraud; and, secondly, to strengthen the conclusion before stated, that the charge given was calculated to mislead the jury, and draw their minds from the points really in contest, as shown by the statements of the evidence.

34

In such a case as the present, and in response to the charge asked by the plaintiffs, the reference to the distinction between *moral* and *legal* fraud, and to the necessity that fraud, to give a right of action, should be *active*, required the explanation, which is shown by the authorities cited. And we may add that, looking at the evidence given in detail, and the facts which, it is said, the evidence tended to establish, the matter in contest was, whether what occurred to the cow really produced the defect alleged, and whether, under the circumstances, it ought to have been communicated. This would naturally lead to the inquiry, as to which there was a conflict in the testimony, whether, had the fact been communicated, and in view of the purpose for which the cow was sold and purchased, it would, among persons ordinarily skilled and conversant in such matters, have materially affected her value for the purpose stated. If it would not, then the plaintiffs, whatever be their own views now as to what they would have done, have no right, their speculation having failed, to complain; for it may well be that others, knowing the fact, would have given substantially the same price for the cow. On the other hand, if among persons ordinarily skilled and conversant in such matters, a knowledge of the fact would have materially affected the value of the cow, and prevented her sale, in view of the other circumstances in the case the jury might be properly asked by the plaintiffs to come to the conclusion that such a fact ought to have been disclosed.

The judgment in this case must be reversed, and the case remanded for further proceedings in the district court.

Judgment reversed

SUTLIFF, C.J., and PECK, BRINKERHOFF and SCOTT, JJ., concurred.